UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
KNOWLEDGE BROWN                                    :

                        Plaintiff,                :  13 Civ. 827 (JMF) (GWG)

        -v.-                                       :  REPORT AND RECOMMENDATION

                                                  :

COMMISSIONER OF SOCIAL SECURITY,                  :

                        Defendant.                :

                                                  :
-------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

        Plaintiff Knowledge Brown brings this action pursuant to 42 U.S.C. § 405(g) to obtain

judicial review of the final decision of the Commissioner of Social Security denying his claim

for Supplemental Security Income under the Social Security Act.  The Commissioner and Brown

have each moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of

Civil Procedure.  For the reasons stated below, the Commissioner's motion should be granted

and Brown's motion should be denied.

I.  FACTS

        A.  Background

        Brown applied for Supplemental Security Income ("SSI") benefits on March 4, 2011,

alleging that he became disabled on December 1, 2009.  R. 146-176.[1]  Brown was born on

October 15, 1980, R. 166, and most recently worked as a seasonal maintenance worker for the

New York City Department of Parks and Recreation, R. 173.  In response to the question on the

application which asked Brown to "[l]ist all of the physical or mental conditions . . . that limit

_____

        [1]  "R." refers to the Administrative Record filed on July 9, 2013 (Docket # 13).

your ability to work," Brown listed four conditions: (1) "anxiety"; (2) "depression"; (3) "schizophrenia"; and (4) "bipolar."  R. 150.

On May 6, 2011, the Commissioner denied Brown's application for disability benefits. R. 52-58.  Brown requested a hearing before an administrative law judge ("ALJ").  R. 60-62. ALJ Eric Borda held a hearing on December 21, 2011.  R. 24-51.  On December 30, 2011, the ALJ issued a decision finding that Brown was not disabled.  R. 9-20.  Brown appealed the ALJ's decision to the Appeals Council but the Appeals Council denied his request for review.  R. 1-8.

Brown filed the instant lawsuit seeking review of the ALJ's decision.  Both parties have moved for judgment on the pleadings.[2]

B.  The Administrative Record Before the ALJ

1.  Treating Source Records

Notwithstanding the claimed disability onset date of December 1, 2009, there are no treatment records for Brown until February 9, 2011, the date on which Brown was hospitalized at Lincoln Medical Center.  On that date, he went to the emergency room reporting that "for the last couple of days he [had] been hearing voices telling him to kill himself."  R. 211.  He was diagnosed with "suicidal ideation," and reported a history of paranoid schizophrenia, but stated that he had not been consistent with his medications for 18 months because he was "afraid of the meds."  Id.  He also stated that he "fe[lt] people [were] following him," had "auditory hallucinations," and said that he "want[ed] to kill himself."  R. 215.  A document titled

---

[2]  See Motion for Judgment on the Pleadings, filed Sept. 4, 2013 (Docket # 16); Plaintiff's Memorandum of Law, filed Sept. 4, 2013 (Docket # 17) ("Pl. Mem."); Notice of Cross-Motion, filed Dec. 16, 2013 (Docket # 25); Memorandum of Law in Support of Defendant's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgement on the Pleadings and Remand, filed Dec. 17, 2013 (Docket # 27).

"Psychiatric Emergency Assessment by Provider," dated February 9, 2011, indicates that Brown's coherence upon admission to the hospital was characterized by "flight of ideas," that he had "possible delusions" as well as "active ideation at present time," and that he also experienced "command hallucinations."  R. 302. He reported that he used marijuana "every morning if he has the money" and that he had used cocaine in the past but not in the previous 18 months.  R. 303.  He had no gross deficits in attention, calculation, recall, language, or visual-motor integrity.  Id.  He had "difficulty completing a sentence," his thought process was "[s]omewhat disorganized [and] rambling," and he was "calm, but unpredictable."  Id.  At that time, Dr. David Hauser diagnosed Brown with chronic paranoid schizophrenia and "cannabis dependence" based on the history he had provided.  R. 304.[3]  He also diagnosed Brown with "cannabis intoxication."  Id.  The doctor ruled out "substance induced psychosis" and "adjustment disorder."  Id.  The psychiatric emergency service assessment also states that Brown's "legal status" was "emergency admission . . . as evidenced by the assessment, the person has a mental illness which is likely to result in serious harm to self or others."  Id.  Dr. Hauser diagnosed "[c]hemical dependence" and "[f]amily problems" on Axis IV of the DSM's multi-axial classification system.  Id.[4]  On Axis V, Dr. Hauser gave Brown a Global Assessment

---

[3]  Dr. Hauser was a resident.  R. 302.  Roy Pronoy, M.D., an attending physician, agreed with Dr. Hauser's assessment.  R. 304-5.

[4]  The DSM is "[a] system of classification, published by the American Psychiatric Association, that divides recognized mental disorders into clearly defined categories based on sets of objective criteria."  Stedman's Medical Dictionary 492 (2th ed. 2000) ("Stedman's"). "DSM is widely recognized as the diagnostic standard . . . ."  Id. The DSM utilizes "a multiaxial system whereby different aspects of a patient's condition could be separately assessed."  Id.  The axes are defined as follows:

Axis I          Clinical Disorders [and] Other Conditions That May Be a Focus of Clinical Attention

Function ("GAF") of "35/55." Id.[5] Dr. Hauser prescribed "Risperidone 1 mg . . . for psychosis."

Id.

On February 10, 2011, Brown was "resting well" at the hospital. R. 306. According to a "Psychiatric Emergency Service Progress Note" from that day, Brown reported that he had not been taking medications "for years" and that "the last time he took them was when he was in jail in Albany . . . on [a domestic violence] charge." R. 208. Brown also reported that he "fe[lt] much better and that he d[id] not belong in the psych ER" and that "his aunt told him to come to the ER and [complain of] voices in his head to help him get his SSI back which he state[d] that he ha[d] received in the past." Id. He stated at that time that he "want[ed] to be discharged ASAP." Id. The hospital record also notes, however, that Brown stated that the reason he

_____

| | |
|---|---|
| Axis II | Personality Disorders [and] Mental Retardation |
| Axis III | General Medical Conditions |
| Axis IV | Psychological and Environmental Problems |
| Axis V | Global Assessment of Functioning |

Diagnostic and Statistical Manual of Mental Disorders  28-32 (4th ed., text revision 2000) ("DSM").

[5]  The GAF Scale used at Axis V is "for reporting the clinician's judgment of the individual's overall level of functioning" and "is divided into 10 ranges of functioning." DSM at 32. Making a GAF rating "involves picking a single value that best reflects the individual's overall level of functioning." Id. Although it is unclear from the record, it appears that Dr. Hauser intended to assess a GAF Score of between 35 and 55. A GAF of 31 to 40 indicates "[s]ome impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." Id. at 34. A GAF of between 41 and 50 indicates "[s]erious symptoms or any serious impairment in social occupational, or school functioning." Id. A GAF of 51 to 60 indicates "[m]oderate symptoms or moderate difficulty in social, occupational, or school functioning." Id. We also note that the Fifth Edition of the DSM, published in 2013, has discarded the multiaxial system of diagnosis, including the use of GAF Scores. See Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013). The DSM IV, however, was in effect at the time of Brown's psychiatric treatment.

reported to the ER was because "he had an argument with his mother and that he decided to come and get help."  Id.

On February 11, 2011, another reassessment/evaluation report indicated that Brown "slept well during the night" with "no incident[s] or aggressive behavior noted."  R. 312.  He was medicated with Benadryl for anxiety and agitation and was "screaming to staff," but verbal therapy was "provided with some effect."  R. 315.  At two times later that day, it was noted that he was "calm,"  R. 316, and that he was "calm, [with] no disruptive behavior,"  R. 317.  Still later that day, he was "irritable at times" but "denie[d] hearing voices."  R. 318.

On the morning of February 12, 2011, Brown underwent a psychiatric evaluation with Vyas Persaud, M.D., during which he stated that he was "feeling better . . . and denie[d] any suicidal/homicidal thoughts or plans."  R. 329.  Dr. Persaud reported that Brown was adequately dressed and groomed, had normal psychomotor activity, and had a logical and goal-directed thought process.  R. 331.  Brown had no gross deficits in attention, calculation, language, visual-motor integrity, insight, or judgment.  Id.  When Brown was awakened that day, he stated that he felt "a lot better" and denied auditory hallucinations and suicidal or homicidal ideation.  R. 332. A nursing note from that date also indicated that Brown was "calm and manageable" with "no acting out behavior."  R. 338.  He was also compliant with his medication regimen and "display[ed] selective social and verbal interaction along with fair personal hygiene and grooming."  Id.  Additionally, he "continue[d] to state that he fe[lt] better at [that] time."  Id.

On February 13, 2011, a nursing note indicated that Brown was still compliant with his medication regime, was "[a]lert and verbally responsive," "denie[d] hearing voices," and had "no acting out behavior."  R. 343.  Psychiatrist Michael Adams, M.D., wrote that Brown was "improving but still with limited insight," though he was denying auditory hallucinations.

R. 348.  Dr. Adams wrote that Brown's psychotic symptoms were "resolving."  Id.  His principal

diagnosis was schizoaffective disorder, unspecified, and he continued Brown on Risperdal.  Id.

A nursing note from later that day again indicated that Brown was denying "perceptual

disturbances," R. 349, and a note from later that evening similarly stated that he "denie[d]

hallucinations [and] ideations" and had "no bizarre behavior [or] acting out," R. 350.

A nursing note from the morning of February 15, 2011, states that Brown "slept well"

and "remain[ed] calm and cooperative."  R. 352.  He was observed to be "up and about [the] unit

with bright affect and good eye contact" and was compliant with his medication regimen.

R. 353.  Later that day, psychiatrist Arnaldo Morejon Suarez, M.D., found that Brown was

"verbal, cooperative, [and in] good physical health."  R. 355.  Dr. Suarez made an Axis I

diagnosis of unspecified psychosis and an Axis IV diagnosis of cannabis abuse, unspecified,

with an Axis V GAF Score of 35.  Id.  Later that evening, a nursing note indicated that Brown

was calm and compliant with medication and unit activities, with no bizarre behavior.  R. 359.

A document titled "Comprehensive Discharge Summary (Psychiatry)," dated February

18, 2011, indicates that Brown was discharged from the hospital on February 18, 2011.  R. 376-

78.  The summary contains the following note:

> Pt. reported that he came to ER on his own to resume his psychiatric treatment
> and follow up appointment.  Pt. said he had been receiving outpatient psychiatric
> treatment at Albany 3 years ago and he was on Zoloft and Zyprexa. Then she [sic]
> moved to NYC.  After he came here he was working and doing better and did not
> feel he needed medication.  So more than 2 years he is out of meds. Today pt.
> says, the day he came to ER (2/9/11) "I decided to come here to start my
> medicine and therapy."

R. 377.  Brown stated that "he did not say in [the] ER that he was hearing voices or had

suicidal/homicidal thought."  R. 377.  Similarly, at the time of discharge, Brown "denie[d]

auditory hallucinations" and denied any suicidal or homicidal ideations.  Id.  Brown was then

6

"on Risperdal [i.e., Risperidone] 2mg." R. 377. Brown's diagnosis was "schizoaffective disorder, unspecified." Id. He was discharged and "encouraged to comply with his aftercare and he was receptive." R. 378. On March 3, 2011, Brown signed a document titled "Attendance Agreement," in which he agreed to attend counseling sessions three times per week. R. 185.

Brown returned to the emergency room at Lincoln Medical Center several times after his discharge. A document titled "Unscheduled [Emergency Department] Non Urgent Visit Note," dated March 16, 2011, indicates that Brown returned to Lincoln Medical Center seeking a refill of Risperdal. R. 256. He had no suicidal or homicidal ideation. Id. The report states "missed psych appt in 7-B." Id. Brown's diagnosis was "Schizoaffective disorder, unspecified," and he "refused to stay for psych." R. 256-57. He was discharged to home or self care. R. 256. Brown visited Lincoln Medical Center for an unscheduled non-urgent visit again on March 17, 2011, at which time he apparently sought a refill for "risperidal/cogentin." R. 258. Brown's diagnosis at this time was "[c]annabis abuse, unspecified." R. 259. He was discharged to home or self care. R. 258. The report further indicates that Brown "[c]ame [for] med re[fill]" and "psych consult placed." R. 259.

### 2. Michael Adams, M.D.

Several months after his discharge, on May 6, 2011, Brown had a session with Dr. Adams. R. 397. Dr. Adams found Brown's coherence to be "goal directed" and his thought content to be "rational/non-psychotic." R. 398. Brown was also logical and had no suicidal ideation. Id. Brown denied any perceptual disorders. Id. He had a depressed mood but no gross deficits in attention, calculation, recall, language, or visual-motor integrity. Id. Dr. Adams found no gross impairments to insight or judgment. R. 399. Dr. Adams made an Axis I diagnosis of schizoaffective disorder and cannabis abuse, an Axis III diagnosis of asthma, an

Axis IV diagnosis of "unemployed," and an Axis V GAF Score of 50. Id. He found that Brown was not at "high risk" status and posed no risk of self harm or violence. Id. Dr. Adams also found that Brown had the "[a]bility to form [a] positive therapeutic relationship." Id.

Brown saw Dr. Adams again for a follow-up visit three months later, on August 17, 2011. R. 411. During this visit, Dr. Adams noted no cognitive deficits and found Brown's thought process during this visit to be "concrete" in coherence and "logical." R. 412. He found no gross impairment to Brown's insight or judgment. R. 413. Brown complained of "lower back pain" and reported audio hallucinations consisting of "people screaming." Id. He also reported experiencing "TV sending messages [and] people on the street looking at him funny." Id. He reported that he stopped smoking cannabis and agreed to an increased dosage of Risperdal. Id. Dr. Adams made an Axis I diagnosis of schizoaffective disorder, an Axis III diagnosis of backache, unspecified, and an Axis V GAF Score of 50. Id.

On August 10, 2011, Dr. Adams provided a psychiatric assessment report, and on August 25, 2011, he completed a "Medical Assessment Report of Ability to do Work-Related Activities," both in response to questionnaires submitted to him regarding Brown's claim for Supplemental Security Income benefits. R. 287-91. He stated that he saw Brown monthly for medication management in sessions lasting from 15 to 30 minutes. R. 287. Recounting Brown's initial visit to the ER, Dr. Adams stated that his urine toxicology was positive for THC, that he was having difficulty completing sentences, and that he had a "terrified" mood." Id. His thought process at that time was "disorganized/rambling" and he suffered from perceptual disturbances consisting of auditory hallucinations to kill himself. Id. His impulse control was "calm but unpredictable" and his "insight and judgment [were] impaired." Id. On the psychiatric assessment form, Dr. Adams provided an Axis I diagnosis of schizoaffective

disorder–depressed type and cannabis abuse/dependence in partial remission.  R. 288.  On Axis II, he ruled out borderline intellectual functioning, and made an Axis IV diagnosis of "family problems."  Id.  Dr. Adams provided an Axis V GAF Score of 35 and a prognosis of "guarded." Id.  In response to a question asking if Brown's impairments "lasted or can . . . be expected to last at least twelve months," Dr. Adams responded "yes" and explained that "[Brown] has a chronic psychiatric illness that will require ongoing treatment."  R. 288.  Dr. Adams checked the boxes indicating that Brown had a "fair" ability to follow work rules and function independently. R. 289.  However, he checked the boxes for "poor/none" with respect to ability to: relate to co-workers; deal with the public; use judgment; interact with supervisors; deal with work stresses; and maintain attention concentration.  Id.  He explained, "[Brown] has a history of learning disabilities that impair his ability to process information."  R. 290.  He checked the box indicating that Brown had a "fair" ability to understand, remember, and carry out simple job instructions, but he checked the boxes for "poor/none" with respect to Brown's ability to understand, remember, and carry out complex job instructions or detailed, but not complex, job instructions.  Id.  Dr. Adams checked the box indicating that Brown had a "fair" ability to maintain personal appearance, but checked the boxes for "poor/none" regarding Brown's ability to behave in an emotionally stable manner, relate predictably in social settings, and demonstrate reliability.  Id.  Finally, he noted that Brown had "learning disabilities that impair his ability to read [and] write" and that he "also appears to have borderline intellectual functioning."  R. 291.

Brown saw Dr. Adams again on September 23, 2011, for a follow-up visit.  R. 414. Brown had no suicidal ideation, was not aggressive or homicidal, and denied any perceptual disorders.  R. 415.  Brown told Dr. Adams he did not like the six milligram dosage of Risperdal because it made him "excited" but he was "unable to elaborate on this."  R. 416.  He denied

having any auditory hallucinations like the ones he had reported during his last visit but said his

house was "very loud."  Id.  He stated that he wanted to decrease his dosage of Risperdal.  Id.

He denied mood symptoms, but Dr. Adams found "his affect was somewhat inappropriate."  Id.

He denied a change in sleep, change in appetite, increased energy, or racing thoughts.  Id.  Dr.

Adams found Brown to be euthymic, with normal psychomotor activity, as well as concrete logic

and rational/non-psychotic thought content.  R. 415.  He found no gross deficits in attention,

calculation, language, visual-motor integrity, insight, or judgment.  R. 415-16.   Dr. Adams

found him to be a "very poor historian at times vague and contradictory" with the result that it

was "difficult to make an appropriate assessment given the difficulty [Brown] ha[d] in giving a

good history."  R. 416.

>        3.  Giselle Gavilanes, LCSW

        Following his discharge from the hospital in February 2011, Brown also met on a number

of occasions with Social Worker Giselle Gavilanes, LCSW.   In a March 25, 2011 note,

Gavilanes states that Brown "was referred to 7B by Orlando Gonzalez, SW from 10A on 2/18/11

after being kept in their unit from 2/9 to 2/18/11."  R. 297.  At the time of this interview with

Gavilanes, Brown's behavior presented "normal Psychomotor Activity."  Id.  He had no suicidal

ideations and was not "aggressive" or "homicidal."  R. 296.  Brown's "thought content" included

"ideas of reference or influence."  Id.  Next to the prompt that says "Perceptual Disorders,"

Gavilanes wrote, "responding to internal stimuli auditory hallucinations."  Id.  Under

"Assessments/Plan," Gavilanes wrote that Brown's problems were "perception disturbances in

the form of auditory hallucinations (not commanding, at this time), depression, blunted affect,

insomnia, energy disturbances (either lack of or sudden bursts), insecurities that lead him to

interpersonal conflicts."  R. 297.  Brown told Gavilanes that he had "frequent arguments with the

mother of his daughter" and added that he "would suddenly hear voices & suffer from headaches, hot flashes & an increase[] of feelings of insecurities." R. 298. She also wrote, "[a]s observed in this interview, the [patient's] mental status include: Alert & oriented x3." R. 297. She diagnosed Brown with "Paranoid Schizophrenia." R. 299. In a section titled "Plan," Gavilanes wrote that Brown had been scheduled for a new patient orientation on April 6, 2011. R. 300. Brown also saw Cecila Purugganan, M.D., on March 25, 2011. R. 388-89. Brown told Dr. Purugganan that he "like[d] Risperidone and that it ke[pt] things sweet." R. 389 (internal quotation marks omitted). He denied audiovisual hallucinations and suicidal or homicidal ideation. Id. Dr. Purugganan renewed Brown's prescription for 2 mg of Risperidone. Id.

On May 16, 2011, Brown attended a psychotic disorders support group led by Gavilanes. R. 406. Gavilanes's report noted that it was Brown's first group participation and that he was "able to relate[] to the articles read & participated in the discussions in a very meaningful manner, despite his reported shyness." R. 407. She added that "[t]he grp gave [Brown] encouraging & supportive feedback." Id. A note from June 14, 2011, indicates that Brown had rescheduled an appointment. R. 408. It states that Gavilanes left a message for Brown on his cellphone, and also sent him a letter instructing him to call and set up an appointment. Id. Gavilanes's note indicates that the day before, Brown had come in but did not sit in the group because he "was upset Dr. Adams filled out SSI papers saying [Brown did not] have any physical limitations." Id. Brown apparently asked to be removed from the group. Id. The purpose of the letter was to "give [Brown] a chance to say how he wants 7B to help him other than filling out SSI papers & get antipsychotic meds." Id.

On July 13, 2011, Gavilanes followed up with Brown's psychiatrist Dr. Adams to ascertain Dr. Adams' recommended course of treatment. R. 409. She wrote, "[Brown] does not

11

show ability to benefit from individual psychotherapy, given his Axis I & II." Id.  She also wrote that "[Brown] tried psychotherapy & reported that he does not get much out of this modality, either." Id.  Gavilanes's notes indicate that Dr. Adams replied to her later that day and indicated, "this [patient] can be maintained on medication only." R. 410.

　　　　　4.  Herb Meadow, M.D.

On April 20, 2011, Brown underwent a psychiatric consultative evaluation with Herb Meadow, M.D., at the behest of the Commissioner.  Tr. 260.  Brown arrived at Dr. Meadow's office by public transportation, which he took on his own.  Id.  Brown told Dr. Meadow that at the time of his hospitalization at Lincoln Medical Center in February 2011, he was suicidal and had been hearing voices, but Dr. Meadow found that "what he described was actually intrusive thoughts rather than hallucinatory experiences." Id.  Brown denied being depressed or suicidal on the day of the examination.  Id.  Dr. Meadow concluded that Brown had no "cognitive deficits." Id.

Dr. Meadow found that Brown's mode of dress was appropriate, neat, and casual, and that he was well-groomed.  R. 261.  His gait, posture, and motor behavior were normal, and his eye contact was appropriate.  Id.  His speech was fluent and clear with adequate expressive and receptive language.  Id.  Brown's thought processes were "[c]oherent and goal directed with no evidence of hallucinations, delusions, or paranoia." Id.  Brown had a clear sensorium.[6]  His attention and concentration were "[i]ntact for counting and calculations" though "[h]e made one mistake doing serial 3s from 20." Id.  His recent and remote memory skills were also intact, and he "was able to repeat 3 out of 3 objects immediately and after five minutes." Id.  Similarly, he

_____

　　　　[6]  "Sensorium" refers to "consciousness" and is "sometimes used as a generic term for the intellectual and cognitive functions." Stedman's at 1619.

could "repeat 4 numbers forward and 2 backward."  Id.

Dr. Meadow found Brown's cognitive functioning to be "[l]ow average" and "[g]eneral fund of information was somewhat limited."  Id.  Brown reported that he takes care of his personal hygiene but does no household chores.  R. 262.  Dr. Meadow found that he had "fair" judgment.  Id.  Brown reported socializing with friends and family and spending his time watching television and going for walks.  Id.  Dr. Meadow concluded that Brown "will be able to perform all tasks necessary for vocational functioning."  Id.  He also wrote, "[t]he results of the exam appear to be consistent with psychiatric problems, but in itself does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis."  Id.  Dr. Meadow made an Axis I diagnosis of "[d]ysthmic disorder"[7] and "[p]anic disorder without agoraphobia."  Id.

### 5.  T. Harding, Ph.D.

On May 5, 2011, T. Harding, Ph.D., performed a "Psychiatric Review Technique." R. 264-77.  Dr. Harding found that Brown had a history of psychosis NOS, dysthymic disorder, and panic disorder.  R. 266-69.  Dr. Harding also completed a "Mental Residual Functional Capacity Assessment" which consisted of "summary conclusions derived from the evidence in file."  R. 278-81.  Dr. Harding rated Brown's functional limitations in four categories: (A) "understanding and memory"; (B) "sustained concentration and persistence"; (C) "social interaction"; and (D) "adaptation."  R. 278-79.  Based upon the evidence in the record, Dr. Harding found that Brown was "not significantly limited" in the following categories: ability to

---

[7]  "Dysthymia" is a "chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some or all of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness."  Stedman's at 556.

remember locations and work-like procedures; ability to understand and remember very short and simple instructions; ability to carry out very short and simple instructions; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to sustain an ordinary routine without special supervision; ability to accept instructions and respond appropriately to criticism from supervisors; ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; ability to be aware of normal hazards and take appropriate precautions; ability to travel in unfamiliar places; and ability to set realistic goals or make plans independently of others.  R. 278-79.  Dr. Harding found that Brown was "moderately limited" in the following categories: ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to work in coordination with or proximity to others without being distracted by them; ability to make simple work-related decisions; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to interact appropriately with the general public; ability to accept instructions and respond appropriately to criticism from supervisors; ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and ability to respond appropriately to changes in the work setting. R. 278-79.

In the section titled "Remarks," Dr. Harding noted that Brown had not kept follow-up appointments since his inpatient treatment.  R. 279.  Dr. Harding also noted, among other things, that Brown's mental status examination was "unremarkable except possible low average cognitive functioning and fair insight/judgment."  R. 280.  He concluded that Brown was able to

maintain personal activities of daily living and could prepare a simple meal but did not do household activities of daily living.  Id.  Dr. Harding also noted that Brown had difficulty paying attention and getting along with people.  Id.  In the section titled "Functional Capacity Assessment," Dr. Harding concluded that Brown had "manifestations of an affective and anxiety disorder but is able to understand, remember and execute simple instructions and worklike procedures and maintain attention and concentration for at least 2 hour intervals."  Id.  Dr. Harding also concluded that Brown "may have some difficulty responding appropriately to other people and changes in a work setting and making judicious work-related decisions."  Id.  Dr. Harding added, "[Brown] is able to perform entry level work in a low contact setting."  Id.

### 6.  The Hearing before the ALJ

The hearing before the ALJ was held on December 21, 2011.  R. 26.  Brown testified that he left school after the ninth grade because of "[l]ack of work, lack of – I went to Job Corps, and for, for leaving school I, I went to Job Corps after I left school."  R. 32.  When asked again why he left school, Brown said, "[b]ecause latenesses, I wasn't – it wasn't, it wasn't – my mom felt it appropriate for me to go to Job Corps."  Id.  He testified that he was in special education and that he was "good with spelling words" but "just had a lot of absences."  R. 33.  He clarified that he had "difficulties" and added, "I didn't want to be in the class, I wanted to go home with my mother, my mom."  Id.  In response to the ALJ's questioning about his past work with New York City, Brown stated that he worked for the city in 2009 cleaning parks.  Id.  According to Brown, this job involved picking up trash and leaves and, although it is not clear from his response, also involved "pools" and a "recreation center."  R. 34.  Brown also confirmed that he worked for Target for six or seven months stocking shelves.  Id.  He had difficulty responding to the ALJ when the ALJ asked why he left.  R. 34-35.  He first began to

say,"I was – I had serious issues, like serious issues like, why I left I was going through – I was, I was on medication, I was on my medication and it just wasn't – you said why did I leave, right?"  R. 34-35.  When the ALJ confirmed that this was the question, Brown said, "[t]he, the man, the boss, he had let me go because I was like – I was in – I was fooling around or something.  I was like fooling – he said I was fooling around with somebody's belongings or something like that; chips, somebody's chips or something."  R. 35.  The ALJ asked if Brown had "difficulty performing that work," and Brown responded that he did and that the "standing, walking" made it hard for him.  Id.  The ALJ seemed puzzled that standing and walking would be hard because he did not see any "physical limitations."  Id.  Brown then stated, "I was – because I was on medication and I had to stay up.  I had the 10:00 shift and it was basically like time for my medicine, and I thought I take that I be tired and, and weared out basically."  Id.

The ALJ then asked Brown about the job as a park worker, specifically asking, "how did you do on that job?"  Id.  Brown said, "I believe I did, I did, I did my best."  Id.  The ALJ asked about "any problems doing that type of work," R. 35, and Brown responded that he had problems like "[l]atenesses and not, not knowing how to do some of it, a lot of it not knowing how to do" and "[g]etting things wrong," R. 36.  The ALJ asked, "[s]o when . . . somebody explains to you how to do something, when somebody gives you instructions, do you have difficulty understanding the instructions and following the instructions?"  Id.  Brown responded in the affirmative.

The ALJ then asked Brown why he was not able to work and what problems keep him from being able to work.  Id.  Brown responded:

> Having issues with my, issues with my – with the hearing voices and stuff, and
> like just, you know, like a – such long time I've been on medication trying to
> treat it, you know, still trying to like take care of myself and I'm getting, I'm

> getting closer – I'm getting – until I get better, to take my medications until I get better, and just I'm really focusing on my health, so it's like, it's kind of hard for like to work.

R. 36-37.  In response to the ALJ's question about how long he had been "hearing voices," Brown said, "[f]or a long time" and, when pressed, said, "[a]bout six years."  R. 37.  The ALJ asked, "how do you hear these voices, in your head?  Does the TV talk to you?"  Id.  Brown interrupted, "[t]he TV talks to me, and my head, too.  It's like they make me so cluttered, and it's so scary.  It scares me to a point I get nervous, real nervous . . . . "  Id.  The ALJ asked what the voices tell him to do, and Brown responded, "[t]hey tell me things like, tell me, tell me, like violent things, violent, violent things, violent things.  I see violent things; hear, hear violent things."  Id.  The ALJ asked if these voices tell Brown to do things, and Brown responded, "[t]hey keep me from doing things.  Like the voices, they keep me from like acting out, acting out, acting out at like I think about it, I hear it, and I, I won't do it.  I just, I just tell somebody, let somebody know how, how it feels and stuff."  Id.  He confirmed that he had been hospitalized "one time for two weeks" because of the voices.  R. 37-38.  The ALJ asked if Brown still hears voices, to which Brown responded in the affirmative.  R. 38.   When asked when he last heard voices, Brown responded:

> I was nervous, I was nervous earlier, like earlier in the day about taking my medicine, because I take my medicine, I said – my medicine said – because I missed taking my medicine, and my medicine said take my medicine.  I took it here, because I heard it, I heard it say that.

Id.  In response to the ALJ's question, Brown confirmed that he indeed heard voices the day of the hearing and that he hears them a "[c]ouple of times a week."  Id.

The ALJ then asked about Brown's medications, and Brown said he takes "Sertraline, Risperidone, and Benzopin [sic]."  Id. (alteration in original).  When asked if there are any side

effects, Brown said they make him "[t]ired, confused and stuff, because I be tired." R. 39.  He

added that he takes the Sertraline for panic attacks, which he has "[e]very day."  Id.  He

described what happens during a panic attack as follows:

> I get – my, my heart, my heart starts beating fast and I get, I get, I go, I go crazy
> like.  And I go – sort of like get out – like I go ah, it gets crazy.  I'm having one
> right now because like on explaining, on expressing, like when I got to talk,
> when [it's] time for me to talk I panic like over words and stuff like that.

Id.  When asked what "brings on" the panic attacks, Brown replied, "being nervous, depressed."

Id.  He said "[a]nything referring to . . . death" makes him nervous, and then started to explain

how the tattoo on his face is related to his father's death, but interrupted himself and said, "I'm

really like – I get real nervous."  R. 39-40.  He added that his "family is dead" and "a lot of

violence . . . gets [him] nervous."  R. 40.  He also testified that missing or not taking his

medication makes him nervous.  Id.

Brown confirmed that he had previously taken Zoloft in 2008 at Whitney Young, a

psychiatric hospital.  R. 40-41.  He testified that he is currently receiving public assistance and

that "they"– presumably referring to officials running the public assistance program – have

excused him from work.  R. 41.  He was asked if he could read and write, and Brown said,

"[n]o, not really."  Id.  He is nearsighted and seemed to imply that he has problems reading as a

result.  Id.  With respect to writing, he said, "I don't write very well," but said he could write his

name.  Id.  He was asked if people "help [him] nowadays," and he said that his mother helps

him.  Id.  He also said that his friend Chris helped him come to the hearing.  R. 42.  When his

lawyer asked if he has "trouble going places" by himself, Brown responded:

> Apparently it would be boring going by myself, and I'd be probably not talking
> which, which makes me nervous when I talk.  And probably like not being able
> to talk to somebody, bringing somebody that could talk to me instead of me just
> sitting that and, you know, just, just mad.

Id.  He testified that he had left school at the beginning of the ninth grade.  Id.

The ALJ then called David Sypher, a vocational expert, to testify at the hearing.  R. 42.
For purposes of his testimony, the ALJ defined the "local region" as the "New York City five-
borough area."  R. 44.  Sypher identified Brown's work performed within the last 15 years as
"stock clerk" and "groundskeeper."  Id.  The ALJ then asked Sypher to assume a person of
Brown's age, education, and work experience who could perform, with no exertional
limitations, work limited to simple, routine, and repetitive tasks.  R. 45.  This person would
need to be allowed to be "off-task" five percent of the workday in additional to regularly
scheduled breaks due to moderately impaired attention and concentration, and would have to
work a job with only occasional changes in work setting, only occasional interaction with the
public, occasional interaction with coworkers and no tandem tasks, and only occasional over-
the-shoulder supervision.  Id.  The ALJ asked if such an individual, with these limitations, could
perform Brown's past work, and Sypher responded that the past work of "groundskeeper"
would be suitable.  Id.  The ALJ then changed the hypothetical by adding that the work would
be limited to "low-stress" jobs (i.e., those having no fixed production quotas, no hazardous
conditions, no decision-making, and no changes in the work setting).  Id.  Sypher again
responded that Brown's past work as "groundskeeper" would be appropriate.  R. 46.  The ALJ
posed a third hypothetical with all of the same limitations as the second hypothetical, but now
the individual would be "off-task" ten percent of the day due to a "moderate to marked attention
and concentration."  R. 46.[8]  After confirming that this "off-task" time would be in addition to
regularly scheduled breaks, Sypher opined that such a limitation would "rule out that work [i.e.,

---

[8] Presumably the ALJ meant to say moderate to marked impairment of attention and
concentration.

works a groundskeeper] and any other work at the simple level." Id.  When asked for clarification about where between five and ten percent of off-task time the limitation would become unacceptable, Sypher opined that at the "unskilled level of work activity . . . the level of employer tolerance is going to be minimal" and that "ten percent is . . . going to be the absolute maximum."  R. 46-47.

Brown's attorney asked Sypher to clarify his testimony regarding the acceptability of "off-task" time of between five and ten percent of the work day.  He asked if "somewhere between five and ten percent . . . would also be a problem," to which Sypher responded that he "would be making somewhat of an educated guess," but that in his opinion, five percent would not "rise to the level of a significant problem, but at ten percent yes . . . it will be a problem." Id.

C.  The ALJ's Decision

On December 30, 2011, the ALJ issued a decision denying Brown's request for SSI benefits.  R. 12-20.  He first found that Brown had not engaged in substantial gainful activity since March 4, 2011, the date he applied for SSI benefits.  R. 14.  He determined that Brown had the following severe impairments: "schizoaffective disorder; dysthymic disorder; panic disorder; rule out borderline intellectual functioning; substance abuse induced psychosis; and cannabis dependence, in partial remission." Id.  The ALJ found that Brown's impairments did not meet or medically equal one of the impairments listed in 20 C.F.R. § 404, Subpt. P, App. 1. Id.

The ALJ next determined that Brown had the residual functional capacity ("RFC"):

to perform a full range of work at all exertional levels but with the following nonexertional limitations: work limited to simple, routine and repetitive tasks; work allowed off task five percent of the workday in addition to regular breaks

20

due to moderately impaired attention and concentration; work limited to low stress jobs defined as having no fixed production quotas, no hazardous conditions, no decision making, and no changes in work setting; only occasional interaction with the public; only occasional interaction with co-workers, with no tandem tasks; and only occasional over the shoulder supervision.

R. 15.  In making this finding, the ALJ stated that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," and that he also considered "opinion evidence."  Id.  In considering symptoms, he was to follow a two-step process.  R. 16.  He first was to ask whether there was an "underlying medically determinable physical or mental impairment" that could be shown by "medically acceptable clinical and laboratory diagnostic techniques . . . that could reasonably be expected to produce [Brown's] pain or other symptoms."  Id.  Next, once such an impairment had been shown, he was to evaluate the "intensity, persistence, and limiting effects" of such symptoms to determine the extent to which they limited Brown's functioning.  Id.  For this purpose, "whenever statements about intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," he was to make a finding on the "credibility of the statements based on a consideration of the entire case record."  Id.

The ALJ noted that Brown "allege[d] disability due to a variety of mental conditions." R. 16.  These included: only having made it to the ninth grade and having been in special education classes while in school; hearing voices approximately twice a week that tell him to do violent things or keep him from doing things; taking medications which make him tired and confused; daily panic attacks that make his heart beat fast and are caused by being nervous or depressed  and by crowds; not being able to read or write anything beyond his name; nearsightedness; and difficulty understanding instructions, which caused trouble at his old job.

Id.

The ALJ found that Brown's medically determinable impairments could reasonably be expected to cause the alleged symptoms, R. 16, but found Brown's statements concerning the intensity, persistence, and limiting effects of the symptoms to be "not fully credible," R. 19. The ALJ emphasized that several times throughout the treatment notes, Brown had been "inconsistent, stating one day that the had auditory hallucinations, and then on another visit stating that he never had them at all." Id. The ALJ also stressed the fact that Brown "repeatedly missed appointments, and stated that he did not want to be in therapy" and that "Ms. Gavilanes noted that [he] only seemed to want his SSI papers filled out and his medications refilled." Id. The ALJ added that Brown's "mental status examinations were consistently normal." Id. With respect to the opinion evidence before the ALJ, he accorded "great weight" to the opinions of Dr. Meadow and Dr. Harding. Id. By contrast, he accorded "little weight" to the opinion of Dr. Adams, Brown's psychiatrist, for several reasons. Id. He found Dr. Adams' opinion to be "inconsistent with the medical evidence" because Dr. Adams stated that "he did not believe [Brown] needed any counseling and that he was having a hard time assessing [Brown's] condition because of his poor ability to give a history, and yet he gave severe limitations on [Brown's] vocational functioning." Id. The ALJ also concluded that Brown's "mental status examinations were consistently normal, and [did] not warrant that level of functional limitation." Id. The ALJ concluded that his RFC assessment was supported by the opinions of Drs. Meadow and Harding, "as well as the medical record which indicates that [Brown] is not as impaired as he alleges." Id.

Finally, the ALJ found that Brown was capable of performing his past relevant work as a groundskeeper because it was within the 15-year recency requirement, because the durational

requirement was met given that Brown worked in that position for six months, and because Brown's earning records indicate that he performed the job at "substantial gainful activity" levels.  Id.  The ALJ found that Brown was able to perform this work after comparing his RFC assessment to the mental demands of this work, and he adopted Sypher's expert opinion that Brown's limitations would allow him to perform this work.  R. 19-20.  The ALJ added that Brown testified that he left the job because it was a seasonal job, so he should be able to do it again despite his limitations.  R. 20.  The ALJ thus concluded that Brown had not been under a disability as defined by the Social Security Act on March 4, 2011, the date of his application. Id.

> D.  Additional Evidence Submitted to the Appeals Council

Brown sought review from the Appeals Council and submitted additional evidence. R. 4-5; 418-75.  Dr. Adams provided a "Treating Physician's Wellness Plan Report" which appears to have been issued by the New York City Human Resources Administration ("HRA"). R. 474-75.  Dr. Adams wrote that Brown's primary diagnosis was "schizophrenia paranoid type."  R. 474.  He indicated that Brown was "fairly groomed [and] cooperative" and that Brown "denied psychotic [symptoms]" and suicidal or homicidal ideations.  Id.  He also indicated that Brown was compliant with scheduled appointments, prescribed medication, and "other types of treatment."  Id.  However, Dr. Adams checked the box stating "Unable to work for at least 12 months (may be eligible for long term disability benefits)."  R. 475.

The evidence submitted to the Appeals Council also included several reports from the Federal Employment and Guidance Service, covering the period from March 1, 2011, to November 9, 2011.  R. 418-73.  On March 1, 2011, Brown reported a "history of auditory hallucinations of command nature" to which he had not responded.  R. 425.  He also denied

23

present auditory hallucinations, and reported that "treatment and medication is working for

him." Id.  He reported that "he fe[lt] the medication [was] working well" but that it caused him

to "feel tired," increased his appetite, caused him trouble sleeping, and caused him "to speak

slowly." R. 453.  He also reported being denied SSI "several times" and that "he would like

assistance with appealing." Id.  In September 2011, he stated that his medication was working

well and that he had no visual or auditory hallucinations "in 6 months" and "denied visual and

auditory hallucinations since on medication 3/11." R. 428.  In a report completed on November

1, 2011, Brown reported a history of auditory commands and reported "his last auditory

command was yesterday." R. 438.  A note contained in this report states, "[c]lient has already

been in the Wellness program and his condition has decompensated." Id.

III.  APPLICABLE LAW

    A.  Scope of Judicial Review under 42 U.S.C. § 405(g)

    A court reviewing a final decision by the Commissioner must determine whether the

Commissioner has applied the correct legal standard and whether the decision is supported by

substantial evidence.  See Selian v. Astrue, 708 F.3d 409, 417 (2d Cir.2013); Talavera v.

Astrue, 697 F.3d 145, 151 (2d Cir. 2012); see generally 42 U.S.C. § 405(g) ("The findings of

the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall

be conclusive . . . . ").  Substantial evidence is "'more than a mere scintilla.  It means such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305

U.S. 197, 229 (1938)); accord Burgess v. Astrue, 537 F.3d 117, 127–28 (2d Cir. 2008);

Matthews v. Leavitt, 452 F.3d 145, 152 n. 9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131

(2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotation marks omitted). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.")). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." Id. (citations and internal quotation marks omitted). The Second Circuit has characterized the substantial evidenced standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (citation omitted). The "substantial evidence" standard means that "once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. (emphasis in original) (citation and internal quotation marks omitted).

B. Standard Governing Evaluation of Disability Claims by the ALJ

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy . . . . " Id. § 423(d)(2)(A).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the

objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective

evidence of pain or disability testified to by the claimant or others; and (4) the claimant's

educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037

(2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that

the Commissioner must use in evaluating a disability claim. See 20 C.F.R. §§ 404.1520(a)(4),

416.920(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process). First, the

Commissioner must determine whether the claimant is currently engaged in any "substantial

gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). Second, if the claimant is

not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a

"severe medically determinable physical or mental impairment," id. §§ 404.1520(a)(4)(ii),

416.920(a)(4)(ii), which is an impairment or combination of impairments that "significantly

limits [the claimant's] physical or mental ability to do basic work activities . . . ," id.

§§ 404.1520(c), 416.920(c). Third, if the claimant's impairment is severe and is listed in 20

C.F.R. § 404, Subpt. P, App. 1, or is equivalent to one of the listed impairments, the claimant

must be found disabled regardless of his age, education, or work experience. Id.

§§ 404.1520(a)(4) (iii), 416.920(a)(4)(iii). Fourth, if the claimant's impairment is not listed and

is not equal to one of the listed impairments, the Commissioner must review the claimant's

residual functional capacity to determine if the claimant is able to do work he or she has done in

the past, i.e., "past relevant work." Id. §§ 404.1520(a) (4)(iv), 416.920(a)(4)(iv). If the

26

claimant is able to do such work, he or she is not disabled.  Id. §§ 404.1520(a)(4)(iv),

416.920(a)(4)(iv).  Finally, if the claimant is unable to perform past relevant work, the

Commissioner must decide if the claimant's residual functional capacity permits the claimant to

do other work.  Id. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the claimant cannot perform

other work, he or she will be deemed disabled.  Id. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The

claimant bears the burden of proof on all steps except the final one — that is, proving that there

is other work the claimant can perform.  See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir.

2009) (per curiam).  "If the claimant satisfies her burden of proving the requirements in the first

four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the

claimant is capable of working."  Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

III.  DISCUSSION

Brown seeks reversal of the ALJ's determination on three grounds: (1) the ALJ violated

the "treating physician rule" by failing to accord controlling weight to the opinion of Dr.

Adams; (2) the ALJ failed to consider the effects of Brown's medications and improperly

assessed Brown's credibility; and (3) the ALJ failed to properly assess the availability of jobs in

the economy by posing inaccurate hypothetical questions to the vocational expert at the

hearing.[9]

A.  Whether the ALJ Violated the "Treating Physician Rule"

In general, an ALJ must give "more weight to opinions" of the claimant's treating

physician when determining if a claimant is disabled.  See 20 C.F.R. §§ 404.1527(c)(2),

416.927(c)(2); see also Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (the ALJ must give

---

[9]  We consider grounds asserted in points (2) and (3) of Brown's brief together.  See Pl.
Mem. at  8-12.

27

"a measure of deference to the medical opinion of a claimant's treating physician").  Treating

physicians "may bring a unique perspective to the medical evidence that cannot be obtained

from the objective medical findings alone or from reports of individual examinations, such as

consultative examinations . . . ."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  An ALJ must

accord "controlling weight" to a treating physician's medical opinion as to the nature and

severity of a claimant's impairments if the opinion "is well-supported by medically acceptable

clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

evidence in [the claimant's] case record . . . ."  Id. §§ 404.1527(c)(2), 416.927(c)(2).  Inversely,

the opinions of a treating physician "need not be given controlling weight where they are

contradicted by other substantial evidence in the record."  Veino v. Barnhart, 312 F.3d 578, 588

(2d Cir. 2002) (citations omitted).

      If the ALJ does not give controlling weight to a treating physician's opinion, the ALJ

must provide "good reasons" for the weight given to that opinion.  Halloran, 362 F.3d at 32–33

(citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)) (internal quotation marks omitted).

When assessing how much weight to give the treating source's opinion, the ALJ should

consider factors set forth in the Commissioner's regulations, which include: (i) the length of the

treatment relationship and the frequency of the examination; (ii) the nature and extent of the

treatment relationship; (iii) the supportability of the opinion with relevant evidence, particularly

medical signs and laboratory findings; (iv) the consistency of the opinion with the record as a

whole; (v) whether the opinion is from a specialist; and (vi) other relevant evidence.  See 20

C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also Ellington v. Astrue, 641 F. Supp. 2d 322,

330–31 ("the ALJ should weigh the treating physician's opinion along with other evidence

according to the factors" listed in 20 C.F.R. §§ 404.1527(c)(2)–(6)).  Courts "do not hesitate to

remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and [should] continue remanding when [they] encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 33.

In the section of his brief addressing the ALJ's application of the treating physician rule, Brown points to the "Treating Physician's Wellness Plan Report" that Dr. Adams submitted to HRA. Pl. Mem. at 2-3 (citing R. 474-75). Brown appears to argue that the ALJ's decision to accord "little weight" to Dr. Adams' opinion, see R. 19, was inappropriate in light of the functional capacity assessment provided by Dr. Adams in the wellness plan report. Brown further argues that "[t]his report was not mentioned or considered in the ALJ's decision," Pl. Mem. at 3. Brown is correct that the ALJ did not consider or mention this report, but this was only because the report was submitted to the Appeals Council after the ALJ had issued his decision. See R. 4-5.

The Second Circuit has held that "new evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision." Perez, 77 F.3d at 45. However, this does not mean that a district court reviewing the ALJ's decision is required "to perform any functions performed by an ALJ." Id. at 46. Rather, "[w]hen the Appeals Council denies review after considering new evidence, [the court] simply review[s] the entire administrative record, which includes the new evidence, and determine[s], as in every case, whether there is substantial evidence to support the decision of the [Commissioner]." Id.; accord Johnson v. Astrue, 2013 WL 1395693, at *6 (S.D.N.Y. Apr. 5, 2013). Accordingly, we will determine whether, considering the new report from Dr. Adams as part of the record, there

was nonetheless substantial evidence to support the ALJ's decision.

We begin by noting that the Commissioner is not bound by a physician's opinion that a claimant is disabled.  See, e.g., Snell v. Apfel, 177 F.3d 128, 133 (2d Cir.1999) ("[T]he ultimate finding of whether a claimant is disabled and cannot work — [is] reserved to the Commissioner.") (internal quotation omitted); Francois v. Astrue, 2010 WL 2506720, at *5 (S.D.N.Y. June 21, 2010) (citing 20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.")).  Thus, to the extent Brown makes the argument, we reject the contention that the Social Security Administration would be required to give controlling weight to Dr. Adams' statement to HRA that Brown was "unable to work for at least 12 months."  See R. 475. Additionally, the report was essentially consistent with other statements made by Dr. Adams, and, as we discuss further below, the ALJ could properly reject Dr. Adams' opinions regarding Brown as inconsistent with other substantial evidence in the record.

Brown also points to the psychiatric assessment report completed by Dr. Adams.  Pl. Mem. at 3 (citing R. 287-91).  In this report, Dr. Adams concluded that Brown had "poor" or no ability to: relate to co-workers, deal with the public; use judgment; interact with supervisors; deal with work stresses; maintain attention and concentration; understand, remember and carry out complex job instructions; understand, remember and carry out detailed, but not complex, job instructions; behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability.  R. 289-90.  Brown argues that "[t]he ALJ stated that Dr. Adams' opinion was inconsistent with the evidence," but he "never asked Dr. Adams to explain the perceived inconsistencies in his assessment, as he is required to do prior to dismissing his functional assessment."  Pl. Mem. at 3 (internal citation omitted).  Furthermore, Brown argues

that because the ALJ determined that Dr. Adams' opinions were not entitled to controlling weight "without seeking additional clarification or information, the ALJ failed to properly developed the administrative record and committed legal error."  Id. at 4.

We disagree with Brown's argument regarding the nature of an ALJ's duty to affirmatively contact a treating physician before choosing to reject that physician's assessment of a claimant's functional capacity.  Certainly, an ALJ is under a duty to develop the record in a social security case.  See 42 U.S.C. § 423(d)(5)(B) (the ALJ "shall make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make" the disability determination); accord 20 C.F.R. §§ 404.1512(d), 416.912(d).  The ALJ's duty to develop the record remains the same regardless of whether the claimant is represented by counsel.  Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (citing Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996)).  Nonetheless, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."  Rosa v. Callahan, 168 F.3d 72, 79 n. 5 (2d Cir. 1999) (citing Perez, 77 F.3d at 48) (holding that where the ALJ had "already obtained and considered reports" from treating physicians,  the ALJ "had before him a complete medical history, and the evidence received from the treating physicians was adequate for him to make a determination as to disability")).  Brown points to case law suggesting that an ALJ has a duty to develop the record where there are "inconsistencies" in a treating physician's records. See Rosa, 168 F.3d at 79 (quoting Hartnett v. Apfel, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998)); see also Calzada v. Astrue, 753 F. Supp. 2d 250, 278 (S.D.N.Y. 2010).  But we read these cases as directing further development of the record only where the record was incomplete.  See, e.g.,

31

Rosa, 168 F.3d at 79-80 (referring to the "numerous gaps in the administrative record that should have prompted the ALJ to pursue additional information regarding [the claimant's] medical history" and the fact that the ALJ "base[d] her conclusions on incomplete information"); see also id. at 80 (ALJ erred by "rejecting a treating physician's medical assessment without fully developing the factual record."); Calzada, 753 F. Supp. 2d at 278-79 (pointing to "the record's incompleteness" and "potential omissions in the medical history before the ALJ," and finding that the ALJ had "fail[ed] to address . . . gaps in the record before concluding that the findings of plaintiff's treating physicians were unsupported by the record").

Here, there is no indication that the ALJ's decision to afford "little weight" to Dr. Adams' opinion resulted from incomplete treating records.  Rather, the ALJ relied on a number of circumstances in reaching this conclusion.  The ALJ found that Dr. Adams' findings of Brown's severe limitations reflected in the psychiatric assessment report, see R. 287-91, were unwarranted based upon Dr. Adams' expressed belief that Brown did not need any counseling and that Dr. Adams was "having a hard time assessing [Brown's] condition" given Brown's poor ability to give a history, R. 19.  The ALJ also pointed to numerous other pieces of evidence that supported his determination, such as statements made by Brown and the consultative physicians' reports.  See generally R. 19.  Thus, the ALJ did not reject Dr. Adams' psychiatric assessment because of an incomplete record, but rather because it was inconsistent with other evidence in the record, as he was permitted to do.  See 20 C.F.R. § 404.1527(c)(2) (ALJ need not give controlling weight to treating source's opinion where it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and where it is "inconsistent with the other substantial evidence in [the] record").

Brown argues that "the ALJ inaccurately conclude[d] that Dr. Adams stated that Mr.

Brown does not need any counseling," that "Dr. Adams never stated or implied that Mr. Brown does not need therapy and counseling," and that "Dr. Adams did not opine that Mr. Brown could be maintained on medication only." Pl. Mem. at 5. However, the July 13, 2011 progress note written by Gavilanes explicitly states: "As per Dr. Adams, this [patient] can be maintained on medication only." R. 410. In any event, Brown's need for therapy was not critical to the ALJ's decision as there was no suggestion by the treating sources that, to the extent Brown could benefit from counseling, that any counseling sessions would affect his ability to perform job functions.

Brown argues that the ALJ failed to explicitly address the factors listed in 20 C.F.R. § 404.1527(c)(2). Pl. Mem. at 4. While it is true that the ALJ did not list the factors in 20 C.F.R. § 404.1527(c)(2), we do not find this omission to require remand, as his decision discusses the substance of these factors, and thus, it is clear that he considered them in assigning "little weight" to Dr. Adams' opinion. See R. 19. The ALJ stated that Brown had seen Dr. Adams on February 13, 2011, R. 17, but that Brown had "only seen [Dr. Adams] a handful of times, mostly for medication management," R. 19. Thus, the ALJ considered the length, frequency, and extent of Brown's treatment relationship with Dr. Adams. The ALJ also noted that Dr. Adams was Brown's psychiatrist, recognizing that Dr. Adams qualifies as a specialist. Id. Finally, as we have already discussed, the ALJ considered the "consistency of the opinion with the record" factor when he found that Dr. Adams' opinion was "inconsistent with the medical record," id. Accordingly, while the ALJ failed to explicitly list each factor, there is no need for remand because he "applied the substance of the treating physician rule." See Halloran, 362 F.3d at 32; accord Botta v. Barnhart, 475 F. Supp. 2d 174, 188 (E.D.N.Y. 2007) ("Although the ALJ should 'comprehensively' set forth the reasons for the weight

33

assigned to a treating physician's opinion, the failure to do so does not require remand if it can

be ascertained from the entire record and the ALJ's opinion that the ALJ 'applied the substance'

of the treating physician rule.") (citations omitted); <u>Hudson v. Colvin</u>, 2013 WL 1500199, at

*10 n. 25 (N.D.N.Y. Mar. 21, 2013) ("While [the ALJ] could have discussed the factors listed

in the regulations in more detail, this does not amount to reversible error because the rationale

for his decision is clear and his ultimate determination is supported by substantial evidence.")

(citation omitted); <u>Oldham v. Astrue</u>, 509 F.3d 1254, 1258 (10th Cir. 2007) (finding that there is

no rule requiring "an ALJ's decision to apply expressly each of the six relevant factors in

deciding what weight to give a medical opinion").

 Brown also takes issue with the ALJ's reliance on the opinions of Drs. Meadow and

Harding.  <u>See</u> Pl. Mem. at 5-7.  Brown first argues that "Dr. Meadow's single examination of

plaintiff cannot reasonably held to override the conclusions of Dr. Adams[], which are based on

numerous visits."  Pl. Mem. at 6.  However, as 20 C.F.R. § 404.1527(e)(2)(iii) makes clear,

ALJs have the authority to "ask for and consider opinions from medical experts on the nature

and severity of [the applicant's] impairment(s)."  Moreover, as the Second Circuit has squarely

stated, "[i]t is an accepted principle that the opinion of a treating physician is not binding if it is

contradicted by substantial evidence, and the report of a consultative physician may constitute

such evidence."  <u>Mongeur</u>, 722 F.2d at 1039 (internal citation omitted).  Here, as the ALJ noted,

Dr. Meadow not only examined Brown but also considered in his opinion "clinical findings as

well as a history of [Brown's] mental illness."  R. 19.  Dr. Meadow's conclusion that Brown

would "be able to perform all tasks necessary for vocational functioning," R. 262, took into

account Dr. Meadow's diagnosis of dysthymic disorder and panic disorder without

agoraphobia, as well as his mental status examination of Brown.  R. 261-62.  The mental status

examination found, among other things, that Brown had "goal directed" thought processes with "no evidence of hallucinations, delusions, or paranoia" and a "clear" sensorium.  R. 261.  Dr. Meadow found "low average" cognitive functioning with a "[g]eneral fund of information [that] was somewhat limited," but "intact" recent and remote memory skills and attention and concentration "intact for counting and calculations."  Id.   The ALJ properly concluded that Dr. Meadow's opinion "constitute[d] evidence substantial and sufficient to contradict the opinion" of Dr. Adams.  Mongeur, 722 F.2d 1039.

　　　　With respect to Dr. Harding, Brown argues that the ALJ "mistakenly relied upon the findings and assessment of the State Agency medical consultant" because "T. Harding never examined or treated Plaintiff and relied solely on the medical records in the administrative record to form his opinions."  Pl. Mem. at 7.  The regulations explicitly state, however, that "State agency medical and psychological consultants . . . are highly qualified  . . . psychologists . . . [and] administrative law judges must consider findings and other opinions of State agency medical and psychological consultants . . . as opinion evidence."  20 C.F.R. § 404.1527(e)(2)(i) (emphasis added).

　　　　Finally, Brown argues that "the record did not contain statements of professional qualification" for Drs. Meadow or Harding.  Pl. Mem. at 7.  This is incorrect.  Dr. Meadow's report states that he is an "M.D." and a "NYS Licensed Psychiatrist."  R. 263.  Similarly, Dr. Harding identifies himself as a "Medical Consultant," R. 280, the ALJ described him as a "State agency psychological consultant," R. 19, and the "Disability Determination and Transmittal" reflects that Dr. Harding holds a Ph.D., R. 53.

B.     Whether the ALJ Failed to Properly Assess the Effects of
       Brown's Medications and Whether the ALJ Improperly Assessed
       Brown's Credibility

"It is the function of the [Commissioner], not [the reviewing courts], to resolve

evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."

Aponte v. Sec'y, Dep't of Health and Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (second

alteration in original) (citation omitted).  The ALJ, "after weighing objective medical evidence,

the claimant's demeanor, and other indicia of credibility . . . may decide to discredit the

claimant's subjective estimation of the degree of impairment."  Tejada, 167 F.3d at 776.

However, where an ALJ rejects witness testimony as not credible, the basis for the finding

"must . . . be set forth with sufficient specificity to permit intelligible plenary review of the

record."  Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260–61 (2d Cir. 1988) (citing

Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 643 (2d Cir. 1983)); accord Snell,

177 F.3d at 135.

Brown contends that the ALJ "failed to consider the effects of [his] medications on his

residual functional capacity."  Pl. Mem. at 8.  More specifically, he argues that the ALJ heard

Brown's testimony that his three medications made him tired, disoriented, and confused, but the

ALJ "did not mention, much less consider, the potential limiting effects of any of these

medications during the decision or in making his residual functional capacity assessment."  Id.

at 8-9.  In fact, the ALJ did consider the potential limiting effects.  In his decision, the ALJ

wrote that Brown "alleges disability due to a variety of mental conditions" and noted that

Brown testified "that he takes medication, which has side effects such as making him tired and

confused."  R. 16.  Thus, the ALJ explicitly considered Brown's claims regarding the side

effects of his medication.  However, the ALJ went on to analyze the credibility of these

complaints, along with other subjective statements, "based on a consideration of the entire case record." Id. Following this analysis, he concluded that Brown's "allegations of disability are not fully credible," R. 19. Moreover, the ALJ provided reasons to doubt Brown's credibility in general. First, he emphasized the inconsistency of Brown's statements in the administrative record, specifically noting that "[s]everal times throughout the treatment notes, [Brown] has been inconsistent, stating on one day that he had auditory hallucinations, and then on another visit stating that he never had them at all." Id. Lack of consistency can be "a strong indication of lack of credibility." Osorio v. Barnhart, 2006 WL 1464193, at *7 (S.D.N.Y. May 30, 2006); accord Podolsky v. Colvin, 2013 WL 5372536, at *19 (S.D.N.Y. Sept. 26, 2013). The ALJ also considered a notation by Dr. Roy stating that Brown's "aunt had told him to go to the emergency room and complain of hearing voices to help him get SSI." R. 16. The ALJ also found Brown's repeated missing of appointments and statements that he did not want to be in therapy inconsistent with his allegations of disability, along with Gavilanes' note indicating that Brown "only seemed to want his SSI papers filled out." R. 19. The ALJ also referenced SSR 96-7P, see R. 15, which states that "[an] individual's statements may be less credible if . . . the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." SSR 96-7P. In sum, the ALJ was entitled to find that Brown was not fully credible and thus could properly have discounted Brown's passing statements that the medication reduced his functional capacity – particularly in light of the fact that Brown points to no treatment record in which a medical professional indicates that Brown's medications limit his ability to function.

Brown argues that the "ALJ improperly assessed plaintiff's credibility by failing to consider the various factors set forth in 20 C.F.R. § 404.1529(c)(3) and failing to provide clear

and convincing reasons for rejecting plaintiff's testimony."  Pl. Mem. at 9.  The cited provision

provides, in relevant part, that in considering symptom-related functional limitations, the

Commissioner will consider "all of the evidence presented."  20 C.F.R. § 404.1529(c)(3); see

also Genier, 606 F.3d at 50 ("Before finding [the claimant] was not a credible reporter of his

own limitations, the ALJ was required to consider all of the evidence of record, including [the

claimant's] testimony and other statements with respect to his daily activities.") (citing 20

C.F.R. § 404.1529).  The ALJ's decision, however, contained an extensive review of the record

evidence, R. 16-19, and specifically discussed important pieces of that evidence in finding

Brown not credible, R. 19.  Thus, there is no reason to conclude that the ALJ failed to consider

all of the evidence that could potentially bear upon the credibility of Brown's hearing

testimony.

   Finally, Brown argues that the ALJ's discussion of Brown's credibility is problematic

because "it suggests that the ALJ made a determination with respect to plaintiff's overall RFC

and then used that RFC to discount plaintiff's non-conforming allegations and resulting

limitations."  Pl. Mem. at 10 (citation and internal quotation marks omitted).  The basis of

Brown's argument that the ALJ evaluated his credibility after determining his RFC is the ALJ's

statement that he found Brown's testimony about his symptoms to be incredible "to the extent

they are inconsistent with the above residual functional capacity assessment."  R. 16.  He cites

Norman v. Astrue, 912 F. Supp. 2d 33 (S.D.N.Y. 2012), in which the court held that "it

appear[ed] . . . that [the] ALJ made a determination with respect to plaintiff's overall RFC and

then used that RFC to discount plaintiff's non-conforming allegations and resulting limitations"

and "[i]f that is what occurred, then the ALJ's credibility assessment (and, thus, the RFC

assessment), was improperly performed."  912 F. Supp. 2d at 86 (citing Meadors v. Astrue, 370

F. App'x 179, 184 (2d Cir. 2010)).  Norman is not on point, however, because the court made

clear that "[w]hat [was] missing from [the ALJ's] analysis [was] any explanation as to why

[p]laintiff's subjective complaints were found less than fully credible."  Id. at 44 (citation and

internal quotation marks omitted) (third alteration in original).  As already discussed, the ALJ

here explained why he found Brown's subjective complaints of disability to be less than fully

credible.  Moreover, when read in context, the quoted language from the ALJ's opinion does

not indicate that the RFC assessment was made without regard to Brown's subjective

complaints.  Instead, the ALJ's decisions specifically details aspects of Brown's symptoms that

were not supported or were contradicted by evidence in the record regarding his allegations of

disability that this symptom would impose on his ability to work.  R. 16-19.  Cf. Decker v.

Astrue, 2013 WL 4804197, at *16 (S.D.N.Y. Sept. 9, 2013) (ALJ's statement that credibility of

statements about claimant's symptoms was decided based on RFC assessment, when read in

context, indicated that ALJ actually considered alleged symptoms in making the RFC

determination).

     C.  Whether the ALJ Failed to Properly Assess the Availability of Jobs in the Economy

     Brown argues that the ALJ's hypothetical question to the vocational expert at the

hearing "was deficient as a matter of law because it did not properly account for [his] age, the

fact that he had borderline cognitive functioning or inability to perform sustained work

activities due to his severe psychiatric limitations."  Pl. Mem. at 12.  He further argues that the

hypothetical "also failed to include any significant memory or concentration problems, even

though the hearing itself was a perfect example of his difficulty concentrating; his impaired

attention and concentration are noted by his treating psychiatrist Dr. Adams."  Id.

     With respect to Brown's demeanor at the hearing, we note that "[w]ithout the benefit of

live testimony, [this court is] not well situated to reevaluate such factors as witness credibility and demeanor." Mainella v. Colvin, 2014 WL 183957, at *5 (E.D.N.Y. Jan 14, 2014). The assertion by counsel that Brown's demeanor at the hearing evinced a degree of impairment not incorporated into the ALJ's hypothetical question to the vocational expert is therefore not sufficient for this Court to conclude that the ALJ erred in formulating the hypothetical. Instead, we must determine if there is "substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion." Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983). In this case, we find that there is substantial evidence to support the wording of the ALJ's hypothetical question, along with the limitations it incorporated. First, it is unclear what limitations Brown believes were imposed by his age, and Brown's brief contains no discussion of how his age of 31 years at the time of the hearing would have imposed additional functional limitations. With respect to the claim that the hypothetical failed to account for his "borderline cognitive functioning," Pl. Mem. at 12, the ALJ expressly ruled out "borderline intellectual functioning" at step two of his analysis, R. 14, a finding not challenged here by Brown. With respect to Brown's claim that the hypothetical failed to account for "significant memory or concentration problems," Pl. Mem. at 12, this claim is rejected inasmuch as the hypothetical assumed an individual with "moderately impaired attention and concentration," R. 45, and the ALJ's finding of such moderate impairments, R. 14; see also R. 17 (Dr. Meadow finds Brown's remote memory to be intact), has similarly not been challenged.

Brown argues that "ALJ did not mention the fact that if the plaintiff would be off task ten percent of the work day he could not perform his previous, or any other job." Pl. Mem. at 13. But the ALJ made no finding that Brown would be "off task" for ten percent of the workday. To the contrary, he found that Brown would be off task for "five percent" of the

workday.  R. 15.  Thus, there was thus no error in the ALJ's basing his step four decision on the conclusion that Brown would be off task five, and not ten, percent of the workday.

In sum, the hypothetical question posed to the vocational expert was consistent with the ALJ's findings and was based upon assumptions supported by substantial record evidence.  See Dumas, 712 F.2d at 1554.

## IV.  CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Docket # 25) should be granted, and Brown's motion for judgment on the pleadings (Docket # 16) should be denied.

**PROCEDURE FOR FILING OBJECTIONS TO THIS
REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a), (b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent tFebruary 7, 2014o the Hon. Jesse Furman, and to the undersigned, at 500 Pearl Street, New York, New York 10007.  Any request for an extension of time to file objections must be directed to Judge Furman.  If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. James, 712 F.3d 79, 105 (2d Cir. 2013); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: February 27, 2014
      New York, New York

 

GABRIEL W. GORENSTEIN
United States Magistrate Judge